BROWNING-FERRIS INDUSTRIES, INC., Petitioner, *v.* THE POLLUTION CONTROL BOARD *et al.*, Respondents.

Third District   No. 3—84—0026

Opinion filed September 10, 1984.

Dorothea O'Dean and Stewart R. Winstein, both of Rock Island, for petitioner.

Neil F. Hartigan, Attorney General, of Springfield (Michael L. Shevick, Assistant Attorney General, of counsel), for respondents.

JUSTICE HEIPLE delivered the opinion of the court:

Petitioner, Browning-Ferris Industries of Iowa (BFI), appeals from orders of the Pollution Control Board denying its applications for the transfer and granting of certain permits sought in connection with the operation of a landfill in Rock Island County. We reverse.

On March 5, 1981, James Kiesow and Melvin Mohr of Rock Island applied to the Illinois Environmental Protection Agency (IEPA) for a permit to develop a solid waste management site. The site was to be located in the city of Milan, Rock Island County.

The application from Kiesow and Mohr listed five sources of waste to be stored at the site: residential, commercial, nonhazardous industrial, nonhazardous agricultural and municipal sludge. On August 28, 1981, the applicants were granted a development permit. The permit provided in pertinent part:

"This permit is granted to handle general refuse excluding all hazardous wastes ***."

The permit also contained the following special condition:

"No wastewater treatment sludges or water treatment sludges shall be received at the site for disposal unless a supplemental permit shall have been received from the Agency."

Ultimately, an operating permit was granted to Kiesow and Mohr on February 9, 1983, which incorporated by reference the terms of the development permit.

Prior to the issuance of the operating permit by IEPA, Kiesow and Mohr applied in December 1982 for two supplemental waste stream permits. No. 822958 was an application to dispose of domestic wastewater sludge from the village of Milan. No. 822959 was an application to dispose of fly ash from the John Deere Harvester Works. Supplemental permits were issued for these waste streams on February 25, 1983, and March 8, 1983, respectively. It is now the position of IEPA that these permits were erroneously granted.

Concurrent with the events described above, BFI had been negotiating through its agents for the purchase of the site from Kiesow and Mohr. On February 18, 1983, BFI and Kiesow and Mohr signed a letter of intent for the sale of the site. On March 8, 1983, the parties reduced their understanding to a formal agreement. The agreement clearly evidences BFI's intent to acquire all necessary permits by transfer or original application for conducting a full-scale landfill operation.

Ultimately, the IEPA denied transfer of the supplemental permits and applications for eight additional supplemental permits. (It had, however, approved the transfer of the operating permit.) IEPA's position was predicated upon two sections of the Environmental Protection Act (Ill. Rev. Stat. 1983, ch. 111½, par. 1001 *et seq.*). Section 39(c) of the Act provides:

"*** no permit for the development or construction of a new regional pollution control facility may be granted *** unless the applicant submits proof to the Agency that the location of said facility has been approved by the County Board of the county if in an unincorporated area, or the governing body of the municipality when in an incorporated area, in which the facility is to be located in accordance with section 39.2 of this Act." (Ill. Rev. Stat. 1983, ch. 111½, par. 1039(c).)

Section 3(x) of the Act defines a "new regional pollution control facility" as:

"(1) a regional pollution control facility initially permitted for

development or construction after July 1, 1981; or

\* \* \*

(3) a permitted regional pollution control facility requested approval to store, for the first time, any hazardous or special waste." Ill. Rev. Stat. 1983, ch. 111½, par. 1003(x).

IEPA contends that the applications filed in December 1982 to handle wastewater treatment sludge and fly ash were a request by Kiesow and Mohr to store for the first time a special waste, thus rendering it a "new" facility within the meaning of the Act. Since no local siting approval had been obtained, IEPA denied transfer of the granted permits to BFI, as well as denying all other applications for supplemental waste stream permits to handle special wastes. Upon appeal to the Pollution Control Board, these denials were affirmed. It is from this decision which BFI appeals.

We cannot countenance IEPA's position. The weakness in their argument stems from the relationship created between IEPA and Kiesow and Mohr in the permitting process. Kiesow and Mohr made it abundantly clear in their applications that the site was intended to handle special wastes. The permits issued limited Kiesow and Mohr to "general refuse excluding hazardous waste." Furthermore, the special conditions attached listed two particular special wastes for which supplemental permits must be sought. The Act does not define "general refuse," so the use of this term by IEPA does not explicitly limit the permittee's right to handle special wastes. We believe that the permits implicitly approve the site's ability to handle special wastes while not explicitly permitting a particular stream. Had the permit read "refuse, excluding hazardous wastes and special wastes pending approval of applications for particular streams," then the applications in question here would clearly be requests for approval for the first time to handle special wastes.

IEPA contends that the term "general," while not statutorily based, should be interpreted as meaning the opposite of "special" in this context. While this is the commonly understood meaning of both words, one cannot interpret them in a vacuum. The addition of the condition forbidding hazardous wastes to the allowance of general refuse is a tacit exclusion of special wastes from the class of forbidden objects. This follows from the maxim of construction *inclusio unius est exclusio alterius*. Adding the fact that the special condition referred specifically to permits for particular special waste streams, it is clear that "general" as used here should be interpreted not in opposition to "special," but rather in its usual sense of "all except that which is specifically excluded from the class."

This construction in no way interferes with the legislative policy inherent in the statute. The siting approval provision protects the public interest in having significant changes in land use subject to scrutiny by its elected representatives. Here, it is clear that BFI's predecessors made a fair disclosure to IEPA that it would seek to handle special wastes. Furthermore, the local authorities were on notice as to the substances to be handled. In fact, the village of Milan, the site of the plant, had contracted with Kiesow and Mohr to handle its wastewater treatment sludges. Thus, it is plain that the policy of reserving local authorities' rights to oversee land use is in no way threatened by this interpretation.

Thus, we remand to the Pollution Control Board with the instruction that the applications be referred to the relevant authorities at the IEPA for consideration on their merits.

Reversed and remanded.

SCOTT and STOUDER, JJ., concur.